Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 935-7400
Email: mhouston@glancylaw.com
Email: bsachsmichaels@glancylaw.com

*Attorneys for Brian Hellman*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

BRIAN HELLMAN, Derivatively on Behalf of Nominal Defendant GREEN DOT CORPORATION,

        Plaintiff,

        v.

STEVEN W. STREIT, MARK SHIFKE, WILLIAM I. JACOBS, KENNETH C. ALDRICH, J. CHRIS BREWSTER, RAJEEV V. DATE, SATURNINO FANLO, GLINDA BRIDGFORTH HODGES, GEORGE T. SHAHEEN, and GEORGE W. GRESHAM,

        Defendant.

        and

GREEN DOT CORPORATION

        Nominal Defendant

Case No.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Brian Hellman ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Green Dot Corporation ("Green Dot" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and unjust enrichment.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Green Dot with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

I.      NATURE AND SUMMARY OF THE ACTION

1.      Green Dot is a financial technology and banking holding company that operates a platform to deploy financial services.  Its products and services include deposit account programs, branded reloadable prepaid gift cards, and secured credit cards.

2.      In February 2018, Green Dot outlined its "Six Step Plan" to "grow revenue, reduce expenses, and appropriately allocate capital, all with the objective of driving EPS growth."  Notably, the first step of this plan involved growing the Company's number of active accounts and to improve the unit economics of those accounts.

3.      Over the next several quarters, Green Dot reported positive financial results, suggesting that Green Dot's strategy was implemented successfully.  As revenue continued to grow, the Company specifically attributed the positive results to the growth in the number of active accounts.  For example, in May 2018, Green Dot reported a 19% increase in the number of active accounts and, in later quarters,

1  the Company continued to report that "growth was driven by an increase year-over-
2  year in [its] active accounts."

3      4.     However, the Company failed to disclose that these results were
4  obtained at the expense of "one and done" customers, who represented a significant
5  source of revenue.

6      5.     The truth began to emerge in a series of partial disclosures.   On
7  February 20, 2019, Green Dot disclosed that active accounts grew by only 1%
8  because the Company was "somewhat a victim of [its] own success in converting
9  more and more quarterly active accounts to direct deposit active accounts."

10     6.     On this news, the Company's share price fell $7.47, or about 10%, to
11 close at $67.20 per share on February 21, 2019, on unusually heavy trading volume.

12     7.     On May 8, 2019, Green Dot unexpectedly disclosed a $60 million
13 investment "for the purpose of aggressively marketing [its] new products."
14 Additionally, it disclosed that its "risk controls, product design elements and
15 marketing strategies have collectively been designed to attract high-value long-term
16 customers, sometimes at the expense of low value or . . . 'one and done' customers."

17     8.     On this news, the Company's share price fell $16.71, or over 26%, to
18 close at $46.56 per share on May 9, 2019, on unusually heavy trading volume.

19     9.     On August 7, 2019, Green Dot disclosed "an accelerated loss of unit
20 sales in [its] prepaid product lines, resulting in lower active accounts" and lowered
21 its fiscal 2019 financial guidance.

22     10.    On this news, the Company's share price fell $19.84, or nearly 42%, to
23 close at $27.42 per share on August 8, 2019, on unusually heavy trading volume.

24     11.    On November 7, 2019, Green Dot reported a 620,000 decline in active
25 accounts year-over-year, which were primarily "onetime use accounts."

26     12.    On this news, the Company's share price fell $5.41, or over 18%, to
27 close at $24.54 per share on November 8, 2019, on unusually heavy trading volume.

28

---

13.     These revelations precipitated the filing of a securities class action against Green Dot and certain of its officers in this District, *Koffsmon v. Green Dot Corporation, et al.*,  Case No. 2:19-cv-10701 (the "Securities Class Action").

14.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of seven members, all of whom are named in this action.  As alleged herein, at least five directors allowed misleading statements to be disseminated: the three directors on the Company's Audit Committee failed to ensure the effectiveness of Green Dot's internal controls and the integrity of its financial statements, and the three directors of the Company's Risk Committee failed to ensure the effectiveness of Green Dot's risk management framework with respect to its new strategy.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiff**

17.    Plaintiff Brian Hellman purchased Green Dot stock in October 2014 and has continuously owned his Green Dot stock since that date.

**Nominal Defendant**

18.    Nominal Defendant Green Dot is a Delaware corporation with its principal executive offices located at 3465 E. Foothill Blvd., Pasadena, California 91107.   The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "GDOT."

**Defendants**

19.    Defendant Steven W. Streit ("Streit") founded Green Dot and served as its Chief Executive Officer from January 2001 to December 2019.   He also served as a director and President of the Company from October 1999 to December 2019.

20.    Defendant Mark Shifke ("Shifke") served as Chief Financial Officer ("CFO") of the Company from December 2015 to December 2019.

21.    Defendant William I. Jacobs ("Jacobs") has served as a director of the Company since April 2016.   He has served as interim CEO since December 2019. According to the Company's 2019 proxy statement, Jacobs is a member of the Risk Committee.

22.    Defendant Kenneth C. Aldrich ("Aldrich") has served as a director of the Company since January 2001.

23.    Defendant J. Chris Brewster ("Brewster") has served as a director of the Company since April 2016.   He has served as interim President since December 2019.   According to the Company's 2019 proxy statement, Brewster is the Chair of the Audit Committee and a member of the Risk Committee.

24.    Defendant Rajeev V. Date ("Date") has served as a director of the Company since April 2016.   According to the Company's 2019 proxy statement, Date is the Chair of the Risk Committee.

25.     Defendant Saturnino Fanlo ("Fanlo") has served as a director of the Company since May 2016.  According to the Company's 2019 proxy statement, Fanlo is a member of the Audit Committee.

26.     Defendant Glinda Bridgforth Hodges ("Hodges") has served as a director of the Company since December 2014.

27.     Defendant George T. Shaheen ("Shaheen") has served as a director of the Company since September 2013.  According to the Company's 2019 proxy statement, Shaheen is a member of the Audit Committee.

28.     Defendant George W. Gresham ("Gresham") served as a director of the Company from May 2016 to May 2019.

29.     The defendants named in ¶¶ 19-28 are sometimes referred to hereinafter as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers, directors, and/or fiduciaries of Green Dot and because of their ability to control the business and corporate affairs of Green Dot, at all relevant times, the Individual Defendants owed Green Dot and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Green Dot in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Green Dot and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Green Dot and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Green Dot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

Because of their advisory, executive, managerial, and directorial positions with Green Dot, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

32.     To discharge their duties, the officers and directors of Green Dot were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Green Dot were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

33.     Green Dot is a financial technology and bank holding company that operates a "Banking as a Service" or "BaaS" platform, which is used by consumer and technology companies to deploy their financial services solutions to their customers and partners.  The Company also offers products under brand names such as Green Dot, GoBank and RapidPay.

34.     Green Dot's products and services include, among others, deposit account programs, branded reloadable prepaid debit cards, consumer checking accounts, small business checking accounts, branded gift cards, secured credit cards.

35.     In February 2018, Green Dot outlined its "Six Step Plan" to "grow revenue, reduce expenses, and appropriately allocate capital, all with the objective of driving EPS growth."  Specifically, the 2018 Plan involves:

**Step 1:** Continue growing our number of active accounts year over year, and improve the unit economics of those accounts.

**Step 2:** Launch a new use case for MoneyPak and continue to increase the number of cash transfer transactions year over year.

**Step 3:** Make strategic investments in new, high potential initiatives.

**Step 4:** Drive increasing efficiencies across our consolidated operating platform to successfully expand margins year over year.

**Step 5:** Continue integration of 2017 acquisitions and look for new strategic acquisitions.

**Step 6:** Return capital to shareholders through share buy-backs.

**B.     The Individual Defendants Cause the Company to Issue Materially Misleading Statements**

36.     On May 9, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to issue a press release announcing its first quarter 2018 financial results.  Therein, Green Dot stated in relevant part:

**Green Dot Reports First Quarter 2018 Results**

- **Sets New Record for Revenue, Adjusted EBITDA, non-GAAP EPS and GAAP EPS**

- **Raises Top and Bottom Line Guidance for Full Year 2018**

- **First Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up 25%, 72% and 65%, respectively**

- **First Quarter 2018 Adjusted EBITDA and non-GAAP EPS up 16% and 40%, respectively**

**Pasadena, CA - May 9, 2018** - Green Dot Corporation (NYSE: GDOT), today reported financial results for the quarter ended March 31, 2018.

For the first quarter of 2018, Green Dot reported total operating revenues of $315.0 million and GAAP net income and GAAP diluted earnings per common share of $70.0 million and $1.29, respectively.

Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $104.1 million and $1.40, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Green Dot's unique "Products and Platform" model and the disciplined execution of our "2018 Six Step Plan" continues to yield very impressive results***, delivering yet another consecutive quarter where we've exceeded our top and bottom line financial expectations and set new records for nearly all key operating metrics in both reporting segments. ***The ongoing financial momentum we are seeing in both Green Dot's own established product lines and those new products being powered by Green Dot's "Banking-as-a-Service," or BaaS, Platform provides us the ability to raise both top and bottom line full year financial guidance***."

(Emphases added.)

37.     The same day, the Company held a conference call in connection with the first quarter 2018 financial results.  During the call, defendant Streit emphasized that customer retention was "more important than the number of active customers." He further stated, in relevant part:

***Of course, in our business, attracting and retaining the right kinds of customers is actually more important than the number of active customers in and of itself***. Specifically, we have previously shared that a direct deposit customer typically has a meaningfully higher lifetime value than accounts that do not receive direct deposit. ***Given the ongoing momentum in our efforts to attract and retain direct deposit accounts, we're proud to share that the number of Green Dot customers who are now receiving direct deposit increased by 930,000 customers year-over-year, meaning that we added 900,000 new direct deposit accounts to our active portfolio as compared to the prior year period, with 80% of all GDV in the quarter being sourced through direct deposit, also setting a new record***. The continuing long-term portfolio mix shift towards higher lifetime value accounts helped push the Account Services gross dollar volume or GDV flowing through our various Account Services products up by 57% year-over-year to more than $11.7 billion, setting another new record for our company.

(Emphases added.)

38.     On May 10, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen and Gresham caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q"), affirming the previously reported financial results.  The report was signed by defendant Shifke.  Regarding active accounts for the first quarter of 2018, the 1Q18 10-Q stated, in relevant part:

Our total operating revenues for the three months ended March 31, 2018 increased $62.0 million, or 24.5%, over the prior year comparable period. ***Our growth was driven by a 19% increase in our active accounts and greater customer engagement as evidenced by growth in gross dollar volume and purchase volume within our Account Services segment.*** Total operating revenues also increased as a result of year-over-year growth in the total number of cash transfers and the number of tax refunds processed within our Processing and Settlement Services segment. In the first quarter of 2018, our Account Services segment had a mix of revenue from both our established product lines and several new product lines. Our new product lines currently have margins below our established product lines and as a result, we experienced year- over-year margin compression during the quarter. In the second half of 2018, we expect the revenue growth from our established product lines, as well as the maturation of our new products will offset the unfavorable mix impact in the first quarter.

(Emphasis added.)

39. On August 8, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to issue a press release announcing its second quarter 2018 financial results. Therein, Green Dot stated in relevant part:

**Green Dot Reports Second Quarter 2018 Results**

- **Achieves Double-Digit Organic Growth Rates in All Key Business Metrics**

- **Second Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up Organically by 16%, 55% and 49%, respectively**

- **Second Quarter 2018 Adjusted EBITDA and non-GAAP EPS up 15% and 35%, respectively**

- **Raises Top and Bottom Line Guidance for Full Year 2018**

**Pasadena, CA - August 8, 2018** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended June 30, 2018.

For the second quarter of 2018, Green Dot reported total operating revenues of $258.3 million and GAAP net income and GAAP diluted earnings per common share of $29.8 million and $0.55, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $57.6 million and $0.74, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Our long term strategic plan to be a 'New Kind of Bank' is yielding very impressive organic results.*** By a New Kind of Bank, we mean a bank that uses technology, ubiquitous digital and retail brick and mortar distribution

and large partnerships to acquire customers instead of branches, and that generates revenue from increasing customer satisfaction, not from increasing customer penalty fees. ***We're very pleased with how we are executing both on our longer term corporate strategies and with our progress toward hitting our targets in the 2018 six step plan***."

(Emphases added.)

40.    The same day, the Company held a conference call in connection with the second quarter 2018 financial results.  During the call, defendant Streit stated that Green Dot's business of selling credit cards and retail was continuing to grow, stating in relevant part:

The question of whether BaaS is bigger depends on how our product side continues to grow, ***and that's also been growing really, really well***. I mean we're experience growth with our -- hate to use the word legacy because the products aren't legacy, they've been redone many, many times. ***But that original part of the business, if you will, selling cards and retail, and what not, that's really growing well for us.*** And the direct deposit penetration and the usage on that also continues to grow very, very well. So it's all growing, and that's what's giving the kind of growth we've had. I mean for a company to be at our size and having record-setting organic growth.

(Emphases added.)

41.    On August 9, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q"), affirming the previously reported financial results.  Defendant Shifke signed the report.  Therein, regarding active account growth, the Company stated, in relevant part:

Our total operating revenues for the three and six months ended June 30, 2018 increased $35.8 million and $97.8 million, respectively, or 16.1% and 20.6%, respectively, over the prior year comparable periods. ***Our growth was driven by a 14% increase year-over-year in our active accounts and greater customer engagement as evidenced by growth in gross dollar volume and purchase volume within our Account Services segment.*** Total operating revenues also increased as a result of year-over-year growth in the total number of cash transfers and the number of tax refunds processed within our Processing and Settlement Services segment. In the first half of 2018, our Account Services segment had a mix of revenue from both our established product lines and several new product lines. Our new product lines currently have margins below our established product lines and as a result, we experienced year-over-year margin compression during the

three and six months ended June 30, 2018. In the second half of 2018, we expect the revenue growth from our established product lines, as well as the maturation of our new products will offset the unfavorable mix impact in the first half of the year.

(Emphasis added.)

42.     On November 7, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to issue a press release announcing its third quarter 2018 financial results.  Therein, Green Dot stated in relevant part:

**Green Dot Reports Third Quarter 2018 Results**

- **Achieves record-setting Q3 revenue**
- **Raises top and bottom line guidance again for full year 2018**

**Pasadena, CA - November 7, 2018** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended September 30, 2018.

For the third quarter of 2018, Green Dot reported total operating revenues of $230.6 million and GAAP net income and GAAP diluted earnings per common share of $4.6 million and $0.08, respectively. Green Dot also reported adjusted EBITDA1 and non-GAAP diluted earnings per common share1 of $45.1 million and $0.59, respectively.

* * *

Said Green Dot Founder and CEO, Steve Streit, "***As evidenced by our double-digit year over year organic growth thus far in 2018, we believe Green Dot's products and platform strategy is in the right place at the right time***. Furthermore, our expanding margins and increasing profitability provides us the ability to incrementally invest selectively in the many new business opportunities and platform enhancements before us such that we can be best positioned to deliver yet another year of double-digit top and bottom line growth in 2019."

(Emphases added.)

43.     On November 9, 2018, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q"), affirming the previously reported financial results. Defendant Shifke signed the report.  Therein, regarding active account growth, the Company stated, in relevant part:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

11

Our total operating revenues for the three and nine months ended September 30, 2018 increased $29.0 million and $126.8 million, respectively, or 14.4% and 18.7%, respectively, over the prior year comparable periods. ***Our growth was driven by an increase year-over-year in our active accounts and*** continuation of greater customer engagement of our new product lines as evidenced by growth in gross dollar volume and purchase volume within our Account Services segment. Total operating revenues also increased as a result of year-over-year growth in the total number of cash transfers and tax refunds processed within our Processing and Settlement Services segment.

44. On February 20, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to issue a press release announcing its fourth quarter and full year 2018 financial results. Therein, Green Dot stated in relevant part:

**Green Dot Reports Fourth Quarter 2018 Results**

- **Fourth Quarter 2018 Total Operating Revenues, GAAP Net Income and GAAP Diluted EPS up Organically by 12%, 17%, and 13%, respectively**

- **Fourth Quarter Adjusted EBITDA and non-GAAP EPS up 37% and 93%, respectively**

- **Announces 2019 financial outlook with expectations for 100% organic double-digit top and bottom line growth ratesat the midpoint of guidance ranges**

**Pasadena, CA - February 20, 2019** - Green Dot Corporation (NYSE: GDOT) today reported financial results for the quarter ended December 31, 2018.

For the fourth quarter of 2018, Green Dot reported total operating revenues of $237.8 million and GAAP net income and GAAP diluted earnings per common share of $14.3 million and $0.26, respectively. Green Dot also reported adjusted EBITDA1 and non- GAAP diluted earnings per common share1 of $43.9 million and $0.56, respectively.

Said Green Dot Founder and CEO, Steve Streit, "***Green Dot's products and platform model generated strong consolidated organic growth in Q4 which capped another truly amazing year of double-digit top and bottom line growth for our company***. Both in the quarter and the full year, Green Dot succeeded in growing topline revenue, adjusted EBITDA and non-GAAP EPS, all well in excess of original guidance, and once again expanded both Q4 and full year operating and adjusted EBITDA margins, despite the continued material investments we've made in our operating platform and our future innovations roadmap.

(Emphases added.)

45.   The same day, the Company held a conference call in connection with the financial results.  During the call, defendant Streit continued touting Green Dot's strategy by emphasizing the increasing success in penetrating its total addressable market ("TAM").  He stated, in relevant part:

> Green Dot's long-term strategy is to create a unique sustainable and highly valuable FinTech ecosystem that fuels the engine of innovation for Green Dot and its many business partners, innovation sells and it's our belief that continuing to focus our energy and resources on our strategy to build the industry's most prolific platform for FinTech innovation, BaaS, Banking-as-a-Service, will help keep Green Dot vital and growing for many years to come.
>
> ***A tangible illustration of this vitality is the increasing success we're having in penetrating Green Dot's growing TAM. Our total addressable market that we believe has expanded over the years to effectively represent the aggregate size of the domestic TAMs of all of our BaaS partners.*** To that point, here is an illustration of the success we're having and increasingly penetrating that total addressable market. ***In 2016, we estimate that approximately 30 million customers used our products and services that year.***
>
> * * *
>
> In 2017, the customers we touch with products and services grew to around 35 million customers, as we added secured credit cards SimplyPaid, Uber and Apple Pay Cash products. Then, in 2018, we served just over 50 million customers, who used a Green Dot product or service as we added into it TaxHawk and other programs, while BaaS partners who went live in prior years continue to see broadening adoption. Because Green Dot started out as a monoline prepaid Company with the legacy active card KPI that reflects only that legacy card business, some might think that the active card KPI is the sum total of our entire active customer base. ***But of course nowadays our card programs are just one part of Green Dot's diverse product suite and our actual customer base is much larger than that.***

(Emphases added.)

46.   The above statements in ¶¶ 36-45 were materially misleading because they failed to disclose: (1) that Green Dot's strategy to attract "high-value" long-term customers was at the expense of "one and done" customers; (2) that Green Dot's "one and done" customers represented a significant source of revenues in its legacy segment; (3) that, as a result, growth in the number of active accounts overstated the success of Green Dot's strategy; and (4) as a result of the foregoing,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

13

Defendants' statements about its business and operations were materially false and misleading at all relevant times.

## C. The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements

47.     During the call discussing fourth quarter and full year 2018 financial results, defendant Streit also began to reveal that Green Dot "was a victim of its own strategy."  He stated, in relevant part:

> In our Account Services segment total revenue in that segment increased by 11% to $200 million with 5.34 million quarterly active accounts up around 1% year-over-year. Our key metrics for the portfolio's health and vibrancy continue to be extremely strong. Specifically, the number of active accounts receiving direct deposit grew by 10% year-over-year and purchase volume grew by very large 11% year-over-year to a new Q4 record of $6 billion.
>
> **So how can our direct deposit and purchase volume metrics be so strong and yet actives be up only 1%. The reason is that we are somewhat a victim of our own success in converting more and more of our quarterly active accounts to direct deposit active accounts.** Here's how the math works. An active account is defined as a single card that has at least one customer generated transaction in the quarter. So, for example, a customer who buys one card every two weeks to say low their wages to the card and then pay bills, shop online or whatever their purpose may be, that one customer would be generating six active accounts in the quarter, but when that same customer buys Just one card in the quarter, decides to enroll in direct deposit and then keep same card in their wallet and uses it the same way every two weeks to pay bills, shop online or whatever their purpose may have been, that same customer is now generating account of just one active account in the quarter.
>
> To this point, of the major Green Dot Bank issued card portfolios. The number of weekly active accounts grew around 8.5% on average in the quarter as compared with a number of weekly active accounts in last year's Q4. The reason is that more customers appear to be increasingly using the card as their top of wallet card with transactions occurring every week, whereas a short-term customer, who doesn't use our card as their top of wallet card, will only use the card occasionally, maybe once every few weeks, but not every week. While the mix shift towards direct deposit and more engaged customers is clearly better for profitability and growth. The lower churn also means fewer accounts issued are short-term customers, which weighs down on unit sales and therefore the quarterly active account metric.

(Emphasis added.)

48.     On this news, Green Dot's stock fell $7.47, or about 10%, to close at $67.20 per share on February 21, 2019, on unusually high trading volume.

49.     On February 27, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results.  The report was signed by defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Hodges, Date, Fanlo, Shaheen, and Gresham.   Regarding active account growth, the Company stated, in relevant part:

> Our total operating revenues for the year ended December 31, 2018 increased 17.0% over the prior year. Our growth was driven by year-over-year increases in both our Account Services and Processing and Settlement Services segments. Within our Account Services segment, revenue growth was driven primarily by year-over-year increases in active accounts throughout the year and the continuation of greater customer engagement of our new product lines as evidenced by growth in gross dollar volume, purchase volume and ATM transactions. Within our Processing and Settlement Services segment, total operating revenues also increased as a result of year-over-year growth in the total number of cash transfers and tax refunds processed, as well as the number of disbursements from our Simply Paid platform.

50.     The above statements in ¶¶ 47, 49 were materially misleading because they failed to disclose that: (1) that Green Dot's strategy to attract "high-value" long-term customers was at the expense of "one and done" customers; (2) that Green Dot's "one and done" customers represented a significant source of revenues in its legacy segment; (3) that, as a result, growth in the number of active accounts overstated the success of Green Dot's strategy; and (4) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

51.     On April 12, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on May 23, 2019.  In the proxy statement, these ten Individual Defendants solicited stockholder votes in favor of two management proposals, including a proposal to

elect Aldrich, Brewster, Hodges, Date, Fanlo, Jacobs, Shaheen, and Streit to new terms as directors.

52.   The proxy statement disclosed that the Board had determined that defendants Streit and Shifke were not independent directors.  Regarding corporate governance, the proxy statement stated:

> Our Board of Directors, as a whole, has responsibility for risk oversight, although the Audit Committee and the Risk Committee and, to a lesser extent, other committees of our Board of Directors oversee and review risk areas for our company and its subsidiary bank. In connection with strengthening the Company's enterprise risk management process, our Board of Directors established a Risk Committee to provide greater oversight of this function. The risk oversight responsibility of our Board of Directors and its committees is supported by our management reporting processes, which are designed to provide visibility to the Board of Directors and to our personnel that are responsible for risk assessment and information about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include, but are not limited to, competitive, economic, operational (including cybersecurity), financial (accounting, credit, liquidity and tax), legal, regulatory, compliance and reputational risks.
>
> Our Audit Committee and Risk Committee meet in executive session with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus. The Audit Committee discusses with management and our independent registered public accounting firm our guidelines and policies to govern the process by which management assesses and manages our company's exposure to risk. The Audit Committee also discusses our major financial risk exposures and the steps management has taken to limit, monitor and control such exposures. Additionally, the Audit Committee oversees our internal audit function. The Risk Committee also reviews strategic, financial, information security and other execution risks and exposures, as well as regulatory exposures and other current matters that may present material risk to the company. Additionally, the Risk Committee oversees our Corporate Risk function. The Audit Committee and Risk Committee receive periodic reports from our Chief Risk and Compliance Officer on our enterprise risk management program. The Compensation Committee reviews risks and exposures associated with leadership assessment and executive compensation programs and arrangements, including incentive plans. The Nominating and Corporate Governance Committee reviews risks and exposures relating to significant legal compliance risks and monitors the steps management has to mitigate these exposures.

53.   The proxy statement was materially misleading because it misrepresented the Board's actual activities with respect to risk management while

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

16

soliciting votes to reelect and compensate directors who were breaching their fiduciary duties. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

54. On May 8, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to issue a press release announcing its first quarter 2019 financial results. Therein, the Company disclosed an unexpected, large "investment in growth for the purpose of aggressively marketing [its] new products." In relevant part:

> Said Mark Shifke, Green Dot's Chief Financial Officer, "We believe now is the right time to accelerate investment in initiatives designed to materially grow both the Products and Platform parts of our business, creating the opportunity to achieve material incremental growth into 2020 and beyond. To that end, **we intend to invest an incremental $60 million for the purpose of aggressively marketing our new products that are set to launch later this year,** and to advance the development and deployment of our BaaS 3.0 and BaaS 4.0 technology platforms in order to meet the increasing demand for these services and capitalize on the resulting revenue opportunities sooner and more assuredly. We expect the incremental $60 million investment could deliver over one million incremental active accounts at the exit of 2019, which, at that number of incremental active accounts, would be expected to deliver incremental lifetime revenue of approximately $200 million to $300 million, at an approximate average contribution margin of 50%. As a result of this $60 million incremental investment, we are revising our 2019 full year adjusted EBITDA and Non-GAAP EPS outlook."

(Emphasis added.)

55. The same day, Green Dot held a conference call in connection with the first quarter 2019 financial results. During the call, defendant Streit disclosed that the Company's strategy of attracting high-value long-term customers at the expense of low value or "one and done" customers had adversely impacted Green Dot's performance. He stated, in relevant part:

> At the same time, we are experiencing some erosion in the number of legacy product line, non-direct deposit active accounts, primarily from our legacy brick and mortar retail channel and to a lesser degree from our RushCard and account now digital direct brands. **Since 2016, when we first introduced our now popular cash back rewards cards, our risk controls, product design elements and marketing strategies have collectively been designed to attract high-value long-term customers sometimes at the expense of low value or what we call "one and done" customers.**

To help you size the revenue difference between the different active account types. A typical direct deposit account across all product lines generates around three times the amount of revenue as an average non-direct deposit active account. While these legacy nondirect deposit customers and especially the non reloading one and done customers that are within that segment are not our best customers by a long shot, *those accounts still generate revenue for us at a better than average contribution margin.*

So while the decline in this low value active component isn't in and of itself, a long-term strategic problem. It is a short-term headwind to overall segment revenue, since revenue is revenue and declining actives in any segment means less revenue. Our belief is that our new Gen Z targeted products as referenced in step one of our Six Step Plan and that are on track to launch in the second half of this year, along with the new and dramatically more compelling value proposition of these new products, will help increase the number of active accounts acquired from our legacy retail and digital direct acquisition channels in an amount sufficient to overcome these active card declines.

But if left uncorrected, we would worry that a continued long-term decline in these legacy non-direct deposit active accounts could pose a headwind to our overall Account Services segment financial plan, although, as you can tell from our Q1 results, this factor didn't appear to impact results in a material way after that point. We do however expect a lower number of legacy non-direct deposit actives to have an impact in Q2, so something for us to watch for sure as we seek to improve this trend when we launch our new and more compelling products in the second half.

(Emphases added.)

56.     On this news, the Company's stock fell $16.71, or over 26%, to close at $46.56 per share on May 9, 2019, on unusually heavy trading volume.

57.     On May 9, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, Shaheen, and Gresham caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"), affirming the previously reported financial results.  The report also stated that revenue derived from card revenues and other fees declined as active accounts shifted toward BaaS programs, which do not carry comparable fees.  Specifically, the report stated, in relevant part:

Our total operating revenues for the three months ended March 31, 2019 increased $20.2 million, or 6.3% over the prior year comparable period. Our growth was driven principally by the continuation of greater customer engagement of our products, in particular those account holders enrolled in direct deposit, as evidenced by our overall

growth in gross dollar volume and purchase volume within our Account Services segment. As a result, these increases in account holder driven behavior resulted in an increase in the interchange revenue earned compared to the prior year period. These increases were partially offset by a small decrease in our card revenues and other fees, in part due to a mix shift in the number of active accounts towards our BaaS programs, which do not carry certain fees that our legacy prepaid products have. Within our Processing and Settlement Services segment, total operating revenues increased as a result of year-over-year growth in the total number of cash transfers, tax refunds processed and disbursements through our Simply Paid platform.

58. On May 28, 2019, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals in the 2019 proxy statement. In particular, Aldrich, Brewster, Hodges, Date, Fanlo, Jacobs, Shaheen, and Streit were reelected to terms as directors. The reelection of these directors based on misleading statements in the 2019 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of defendants at the expense of the Company's unaffiliated stockholders.

59. On August 7, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, and Shaheen caused Green Dot to issue a press release announcing its second quarter 2019 financial results. Therein, Green Dot disclosed additional problems with the legacy products and reduced its fiscal year outlook, stating in relevant part:

> Said Mark Shifke, Green Dot's Chief Financial Officer, "*On a year-over-year basis, we experienced an accelerated loss of unit sales in our prepaid product lines, resulting in lower active accounts from both non-reloading customers and cash reloading customers*. We expect the trend of lower active accounts to continue into Q3, before starting to moderate in Q4. We believe the launch of our new branded products and certain BaaS programs that are expected to ramp over time will lead us back to active account and associated revenue growth in 2020. Based on the lower number of active accounts at the end of Q2, our expectations for prepaid unit sales through the end of the year, and that our new product launched only one week ago, we now believe there is insufficient time remaining in the year for the revenue generated from the issuance of our new product to overcome the loss of revenue resulting from the lower number of active accounts in our legacy prepaid product line. As such, we are readjusting our expectations for the remainder of this year."

* * *

Total Non-GAAP Operating Revenues

- Green Dot now expects its full year non-GAAP total operating revenues2 to be between $1.060 billion and $1.080 billion, representing 5% year-over-year increase at the mid-point, versus its previous guidance of $1.114 billion to $1.134 billion.

- For Q3, Green Dot expects non-GAAP total operating revenues2 to be between $225 million and $230 million.

Adjusted EBITDA

- Green Dot now expects its full year adjusted EBITDA2 to be between $240 million and $244 million, representing a 12% year-over-year decline at the mid-point, versus its previous guidance of $255 million to $261 million.

- For Q3, Green Dot expects adjusted EBITDA2 to be between $12 million and $14 million. This guidance includes a majority of the $60 million incremental marketing and technology investments we allocated during the second half of 2019.

Non-GAAP EPS2

- Green Dot now expects its full year non-GAAP EPS2 to be between $2.71 and $2.77, representing a 17% year-over-year decline at the mid-point, versus its previous guidance range of $2.82 to $2.91.

- For Q3, Green Dot expects non-GAAP EPS2 to be approximately $0.02.

(Footnotes omitted, emphasis added.)

60.    The same day, the Company held a conference call to discuss the financial results with analysts and investors.  During the call, defendant Streit stated, in relevant part:

While Mark will share more context around our financial performance and guidance during his section of the call, I want to address upfront that we're lowering full year guidance. While disappointing and unfortunate, it is necessary as a result of an acceleration in declining unit sales in our legacy prepaid card product line combined with a later than expected launch of our new and limited product and a large BaaS program that together make it now unrealistic for us to achieve the growth we had attended in the second half.

We believe the underlying reasons are contained to only our legacy prepaid business line and are likely to impact only this year's revenue growth trajectory as expected performance of our new products and our

BaaS programs should help us return to healthy growth rates again next year. So now let's get into the numbers.

Green Dot's products and platform model generated Q2 consolidated non-GAAP total operating revenues of $265 million, a 5% year-over-year increase. The largest drivers of the growth were our BaaS Platform product line and from growth in our processing and settlement segment. *However, our Account Services segment underperformed our expectations in the quarter and the first half in general, due primarily to a decline in our legacy non[-]direct deposit active accounts, which we identified as a potential headwind on our last call. These declines continued and accelerated in Q2, resulting in lower than anticipated prepaid unit sales that has caused a material reduction in active prepaid accounts.*

(Emphasis added.)

61.    On this news, the Company's stock price fell $19.84, or nearly 42%, to close at $27.42 per share on August 8, 2019, on unusually heavy trading volume.

62.    On August 9, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, and Shaheen caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"), affirming the previously reported financial results.  The Company also stated that the number of active accounts declined due to changes in the competitive environment.  Specifically, the 2Q19 10-Q stated, in relevant part:

Our total operating revenues for the three and six months ended June 30, 2019 increased $14.5 million and $34.7 million, respectively, or 6% over each of the prior year comparable periods, generating revenue growth from both our Account Services and Processing and Settlement Services segments. Our growth within our Account Services segment was driven principally by an increase in account holders enrolled in direct deposit despite an overall decline in the number of active accounts in our Account Services segment over the same period. As a result, we experienced overall growth in gross dollar volume and purchase volume and corresponding growth in interchange revenue over each of the prior year comparable periods. We also experienced a year-over-year increase in net interest income due to higher yields on our cash and investment balances as a result of rate increases by the Federal Reserve over the course of 2018. Within our Processing and Settlement Services segment, total operating revenues increased as a result of year-over-year growth in the total number of cash transfers and disbursements through our Simply Paid platform for the three and six months ended June 30, 2019 compared with the prior year periods, and an overall increase in the number of tax refunds processed through the first half of 2019 versus the prior year comparable period.

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

21

As of June 30, 2019, ***our active accounts declined by approximately 500,000 on a year-over-year basis primarily due to a decline in the number of non-direct deposit active accounts under our legacy branded account programs***, partially offset by an increase of approximately 240,000 active accounts under our BaaS programs. The decline in our active accounts in recent periods is attributable in part to changes in our competitive environment, particularly as new entrants market largely free bank account offerings.   While we expect these trends to continue to negatively impact our number of active accounts for the remainder of 2019, we believe the trend will moderate in Q4 2019 and we are well positioned with our innovative product roadmap and strong infrastructural competitive advantages to address these competitive pressures and return to active account and associated revenue growth beginning in 2020.

63.     The above statements in ¶¶ 54-55, 57, 59-60, 62 were materially misleading because they failed to disclose that: (1) that Green Dot's strategy to attract "high-value" long-term customers was at the expense of "one and done" customers; (2) that Green Dot's "one and done" customers represented a significant source of revenues in its legacy segment; (3) that, as a result, growth in the number of active accounts overstated the success of Green Dot's strategy; and (4) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

**D.     The Truth Fully Emerges**

64.     On November 7, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, and Shaheen caused Green Dot to issue a press release announcing its third quarter 2019 financial results.   During the conference call held the same day in connection with these results, defendant Streit revealed that the continuing year-over-year decline of accounts in its active consumer business approximated 620,000 and were mostly "onetime use accounts." Defendant Shifke added that while they were iterating the full year guidance, they expected Green Dot's financial results to be at the lower end of it.

65.     On this news, the Company's stock price fell $5.41, or over 18%, to close at $24.54 per share on November 8, 2019, on unusually heavy trading volume.

---

66.   On November 12, 2019, defendants Streit, Shifke, Jacobs, Aldrich, Brewster, Date, Fanlo, Hodges, and Shaheen caused Green Dot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q19 10-Q"), affirming the previously reported financial results.  Regarding active accounts, the 3Q19 10-Q stated, in relevant part:

> Our total operating revenues for the three and nine months ended September 30, 2019 increased $4.1 million, or 2%, and $38.8 million, or 5%, respectively, over the prior year comparable periods. For the three months ended September 30, 2019, the year-over-year increase was driven primarily by revenue growth in Platform Services in our Processing and Settlement Services segment, primarily as a result of year-over-year growth in the total number of cash transfers and disbursements through our Simply Paid service. This increase was partially offset by a 4% decline in revenues from our Account Services segment, primarily attributable to an overall decline of 5% in the number of active accounts. Similar to the second quarter of 2019, our Consumer Programs experienced a year-over-year decline in active accounts, offset partially by growth in our Platform Service offerings from our BaaS and PayCard and Wage Disbursement programs. The growth in our Platform Services powered year-over-year growth of 4% in the number of direct deposit active accounts, which contributed to year-over-year growth of 8% in gross dollar volume and 2% in purchase volume, and corresponding growth in interchange revenue of 4% during the three months ended September 30, 2019. Account holders enrolled in direct deposit tend to generate higher levels of gross dollar volume and purchase volume than other active accounts, and consequently have a greater impact on the amount of interchange revenue we earn.
>
> For the nine months ended September 30, 2019, our revenue growth was primarily driven by our Processing and Settlement Services segment, as a result of year-over-year growth in the total number of cash transfers, disbursements through our Simply Paid platform and tax refunds processed. Our Account Services segment also increased revenue year-over-year by 2%, principally due to an increase in the number of direct deposit active accounts, despite experiencing a year-over-year decline in our total number of active accounts. Our Account Services revenue during the nine months ended September 30, 2019 also benefited from a strong year-over-year increase in net interest income due to higher yields on our cash and investment balances as a result of the full year impact in 2019 of the rate increases by the Federal Reserve over the course of 2018 and higher average balances thereof. In future periods we may experience declines in our net interest income due to an evolving interest rate environment. As a result of uncertainties around global economic growth and trade, the Federal Reserve recently announced a reduction in short-term interest rates, with additional reductions possible in the future. Further reductions in short-term interest rates could result in a decrease in the amount of net interest income we earn for the remainder of the year and in the near term.

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

23

The decline in our active accounts in recent periods is in part attributable to changes in our competitive environment within our Consumer Programs, particularly as new entrants market largely free bank account offerings.  While we expect these trends to continue to negatively impact our number of active accounts for the remainder of 2019, we believe the early adoption rates for our new products, our innovative product roadmap and our strong infrastructural competitive advantages make us well positioned to address these competitive pressures.

67.    On December 18, 2019, Green Dot announced that defendant Streit and defendant Shifke would leave the Company.  In a press release, the Company stated, in relevant part:

Green Dot Corporation (NYSE: GDOT) ("the Company") today announced the retirement of Green Dot CEO and Founder, Steve Streit. Mr. Streit will also retire from Green Dot's Holding Company Board and as Chairman of the Green Dot Bank board. Mr. Streit's retirement initiates an orderly management succession and transition process under which Mr. Streit will transition to the role of "Chief Innovation Officer" as an independent advisor while Green Dot Board Chairman, William I. Jacobs, will serve as interim Chief Executive Officer and J. Christopher Brewster, Chair of the Audit Committee, will serve as interim president. As part of this process, Green Dot CFO, Mark Shifke, will retire concurrent to Mr. Streit and Jess Unruh, Operational Chief Financial Officer and Chief Accounting Officer, will serve as interim Chief Financial Officer. All transitions will become effective on December 31, 2019.

## VI.    DAMAGES TO THE COMPANY

68.    As a direct and proximate result of the Individual Defendants' conduct, Green Dot has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

(a)    Legal fees incurred in connection with the Securities Class Action;

(b)    Any funds paid to settle the Securities Class Action; and

(c)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Green Dot.

69.    In addition, Green Dot's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true

condition of its business.  The credibility and motives of management are now in serious doubt.

70.     The actions complained of herein have irreparably damaged Green Dot's corporate image and goodwill.  For at least the foreseeable future, Green Dot will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Green Dot's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff brings this action derivatively in the right and for the benefit of Green Dot to redress injuries suffered, and to be suffered, by Green Dot as a direct result of breaches of fiduciary duty by the Individual Defendants, violations of Section 10(b), 14(a) and 20(a) of the Exchange Act, and unjust enrichment. Green Dot is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

72.     Plaintiff will adequately and fairly represent the interests of Green Dot in enforcing and prosecuting its rights.

73.     Plaintiff has continuously been a shareholder of Green Dot at times relevant to the wrongdoing complained of and is a current Green Dot shareholder.

74.     When this action was filed, Green Dot's Board of Directors consisted of defendants Jacobs, Aldrich, Brewster, Date, Hodges, Shaheen, and Fanlo. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Brewster, Fanlo, and Shaheen**

75.     Brewster, Fanlo, and Shaheen serve as members of the Company's Audit Committee.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, Brewster, Fanlo, and

Shaheen failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures.   Thus, Brewster, Fanlo, and Shaheen breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Date, Brewster, and Jacobs**

76.   Date, Brewster, and Jacobs serve as members of the Company's Risk Committee.   As such, they are responsible for the effectiveness of the Company's risk management framework and reviewing the key risk types facing the Company. As alleged herein, Date, Brewster, and Jacobs failed to ensure that Green Dot mitigated risks in connection with the new strategy for acquiring high value customers.   Thus, Date, Brewster, and Jacobs breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Jacobs and Brewster**

77.   Jacobs and Brewster serve as interim CEO and interim President, respectively.   As such, Jacobs and Brewster are primarily employed by the Company, and could not disinterestedly consider a demand to investigate their wrongdoing.   Thus, demand is excused as to them.

**Jacobs, Aldrich, Brewster, Date, Hodges, Shaheen, and Fanlo**

78.   Jacobs, Aldrich, Brewster, Date, Hodges, Shaheen, and Fanlo could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in April 2019.   These seven directors issued the proxy statement knowing that the representations made in the Company's public filings were misleading as to Green Dot's strategy for acquiring customers, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in May 2019.   Had these seven directors truthfully and completely revealed the misleading nature of the Company's public statements and of subsequent disclosures, Jacobs, Aldrich, Brewster, Date, Hodges, Shaheen, and Fanlo would not have been reelected as directors.   As a result, Jacobs, Aldrich, Brewster, Date,

Hodges, Shaheen, and Fanlo would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

79.	Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.	Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Green Dot's business and affairs, particularly with respect to issues as fundamental as public disclosures.

81.	The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Green Dot.

82.	In breach of their fiduciary duties owed to Green Dot, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

83.	In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

84.	As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Green Dot has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

85.	Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

# COUNT II

**(Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Individual Defendants)**

86.     This Count is asserted on behalf of the Company against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

87.     Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the misleading disclosures, which were intended to, and did deceive the Company: (a) that Green Dot's strategy to attract "high-value" long-term customers was at the expense of "one and done" customers; (b) that Green Dot's "one and done" customers represented a significant source of revenues in its legacy segment; (c) that, as a result, growth in the number of active accounts overstated the success of Green Dot's strategy; and (d) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

88.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that he (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business

that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

89.  As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Green Dot, their control over, and/or receipt and/or modification of Green Dot's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Green Dot, participated in the fraudulent scheme alleged herein.

90.  As a result of Defendants' misconduct, Green Dot the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

91.  Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT III

**(Derivative Claim for Violations of Section 20(a) of the Exchange Act Against Defendants Streit and Shifke)**

92.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.  This Count is asserted on behalf of the Company against defendants Streit and Shifke for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

94.    During their tenure as executive officers, defendants Streit and Shifke were controlling persons within the meaning of Section 20(a) of the Exchange Act. By reason of their absolute control, defendants Streit and Shifke had the power and authority to direct the management and activities of the other executive employees, to hire and fire other executive employees at whim, and to cause other executive employees to engage in the wrongful conduct complained of herein. Defendants Streit and Shifke were able to and did control, directly or indirectly, the content of the public statements made by all other executive employees at all relevant times, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

95.    In their capacity as the senior executives, defendants Streit and Shifke had direct involvement in and oversight over the day-to-day operations of the executive employees and the Company's employees, who would not act unless defendants Streit and Shifke agreed with their course of conduct.

96.    As set forth above, defendants Streit and Shifke violated Section 10(b) of the Exchange Act by their acts and omissions as alleged herein. To the extent defendants Streit and Shifke are not the makers or disseminators of a specific false or misleading statement made by the Company, defendants Streit and Shifke are liable pursuant to Section 20(a) of the Exchange Act.

97.    As a direct and proximate result of their conduct, the Company suffered damages in connection with its misleading disclosures.

## COUNT IV

### Violations of Section 14 of the Securities Exchange Act of 1934

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at

the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statement filed on April 12, 2019 violated §14(a) and Rule 14a-9 because it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

100.   In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

101.   The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.   The 2019 proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) ratification of the appointment of the Company's independent auditor.   The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

102.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT V

### Against All Defendants for Unjust Enrichment

103.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Green Dot.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Green Dot.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

105.   Plaintiff, as a stockholder and representative of Green Dot, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

106.   Plaintiff, on behalf of Green Dot, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Green Dot, demands judgment as follows:

A.   Declaring that plaintiff may maintain this action on behalf of Green Dot and that plaintiff is an adequate representative of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Green Dot;

D.   Directing Green Dot to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Green Dot and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

3. a proposal to strengthen Green Dot's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of Green Dot to nominate at least three candidates for election to the Board;

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Green Dot has an effective remedy;

F.     Awarding to Green Dot restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

DATED:  February 18, 2020          **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 935-7400

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Brian Hellman*

## GREEN DOT CORPORATION VERIFICATION

I, Brian Hellman, hereby verify that I am familiar with the allegations in the Stockholder Derivative Complaint, and that I have authorized the filing of the Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2-18-2020

Brian Hellman