JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| DINO DIBLASIO, derivatively on behalf of Green Dot,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN W. STREIT, et al.,<br><br>Defendants,<br><br>and<br><br>GREEN DOT CORPORATION,<br><br>Nominal Defendant. | Case No. 2:20-cv-01572-FLA-E<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED SHAREHOLDER COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing<br>Date: January 8, 2027<br>Time: 1:30 p.m.<br>Judge: Hon. Fernando L. Aenlle-Rocha<br>Ctrm: 6B |

# NOTICE OF MOTION AND MOTION TO DISMISS

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 8, 2027, at 1:30 p.m., or at such later date and time as the Court may order, Defendants Steven W. Streit, Mark Shifke, Jeffrey B. Osher, Ellen Richey, William I. Jacobs, J. Chris Brewster, Rajeev V. Date, Saturnino Fanlo, Dan R. Henry, Glinda Bridgforth Hodges, George T. Shaheen, George W. Gresham, Michelleta Razon, and Robert Millard (collectively, the "Defendants") will and hereby do move the Court for an order dismissing Plaintiff's Consolidated Amended Complaint with prejudice. This motion is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The motion is based on this Notice and the Memorandum of Points and Authorities below; the accompanying Request for Judicial Notice and exhibits attached thereto; the papers on file in the action; argument of counsel at the hearing; and other such matters as may be judicially noticed or come before the Court at the hearing on this matter.

This motion is made following the conference of counsel pursuant to Civil Local Rule 7-3 and the Court's Standing Order, which took place on October 2, 2026. The conference did not resolve the issues underlying Defendants' Motion to Dismiss.

Dated: October 9, 2026

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *<u>/s/ James N. Kramer</u>*
JAMES N. KRAMER
M. TODD SCOTT

Attorneys for Defendants Steven W. Streit, Mark Shifke, Jeffrey B. Osher, Ellen Richey, William I. Jacobs, J. Chris Brewster, Rajeev V. Date, Saturnino Fanlo, Dan R. Henry, Glinda Bridgforth Hodges, George T. Shaheen, George W. Gresham, Michelleta Razon, and Robert Millard

# TABLE OF CONTENTS


Page

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 2

A. PLAINTIFF'S DERIVATIVE CLAIMS FAIL ON THE MERITS ..... 2

1. Plaintiff Fails to Plead a Section 14(a) Claim, Which Eliminates the Sole Basis for Federal Jurisdiction ..................... 3

a. Plaintiff Disclaims Fraud, So the Claim Is Exculpated .... 4

b. Plaintiff Does Not Plead An Actionable Misstatement .... 5

c. Plaintiff Does Not Plead a Strong Inference of Negligence ........................................ 6

d. Plaintiff Cannot Plead Causation ........................................ 7

2. Plaintiff Fails to State a Claim for Breach of Fiduciary Duty ..... 8

3. Plaintiff's Abuse Of Control Claim Also Fails ........................ 14

4. Plaintiff Cannot State a Claim for Unjust Enrichment ............. 14

B. PLAINTIFF'S MERGER CLAIMS SHOULD BE DISMISSED ...... 15

1. Plaintiff Lacks Standing to Assert the Merger Claims ............. 15

a. The Consent Decree Claim is Derivative ........................ 15

a. The Litigation Asset Claim Lacks *Primedia* Standing ... 18

2. The Merger Claims Fail to State a Claim in Any Event ........... 19

III. CONCLUSION ........................................ 22

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Amazon.com, Inc. S'holder Deriv. Litig.*, 2024 WL 342405 (W.D. Wash. Jan. 30, 2024) .......... 13

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) .......... 13

*In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) .......... 13

*Blue v. Fireman*, 2022 WL 593899 (Del. Ch. Feb. 28, 2022) .......... 17

*Brody v. Transitional Hosp. Corp.*, 280 F.3d 997 (9th Cir. 2002) .......... 11

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) .......... 12, 21

*City of Birmingham Relief & Ret. Sys. v. Hastings*, 2019 WL 3815722 (N.D. Cal. Feb. 13, 2019) .......... 3, 4, 7, 8

*Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015) .......... 19

*In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019 (Del. Ch. Mar. 31, 2009) .......... 19, 20

*Cygnus Opportunity Fund, LLC v. Wash. Prime Grp.*, 302 A.3d 430 (Del. Ch. 2023) .......... 10

*Deseret Tr. Co. v. Unique Inv. Co.*, 2019 WL 7938223 (C.D. Cal. Sept. 10, 2019) .......... 11

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) .......... 13

*Dieterich v. Harrer*, 857 A.2d 1017 (Del. Ch. 2004) .......... 15

*Dohmen v. Goodman*, 234 A.3d 1161 (Del. 2020) .......... 10

## TABLE OF AUTHORITIES (CONTINUED)

**Cases** **Page(s)**

*In re Dura Pharms., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006) .......... 10

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) .......... 6

*Gera v. Palihapitiya*,
2024 WL 3818602 (D. Ariz. Aug. 14, 2024) .......... 5, 6

*Golub v. Gigamon Inc.*,
847 F. App'x 368 (9th Cir. 2021) .......... 3

*Hutton v. McDaniel*,
264 F. Supp. 3d 996 (D. Ariz. 2017) .......... 11

*Kelley v. Rambus, Inc.*,
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) .......... 3

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) .......... 6

*Kramer v. W. Pac. Indus., Inc.*,
546 A.2d 348 (Del. 1988) .......... 17, 18

*In re Massey Energy Co.*,
2011 WL 2176479 (Del. Ch. May 31, 2011) .......... 20, 21

*In re Massey Energy Co. Deriv. & Class Action Litig.*,
160 A.3d 484 (Del. Ch. 2017) .......... 16

*In re Maxwell Techs., Inc. Deriv. Litig.*,
2014 WL 2212155 (S.D. Cal. May 27, 2014) .......... 10

*Mehedi v. View, Inc.*,
2024 WL 3236706 (N.D. Cal. June 28, 2024) .......... 7

*Mendoza v. HF Foods Grp. Inc.*,
2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) .......... 7

*Michel v. Sumo Logic, Inc.*,
779 F. Supp. 3d 1038 (N.D. Cal. 2025) .......... 7

## TABLE OF AUTHORITIES (CONTINUED)

**Cases** **Page(s)**

*New Enter. Assocs. 14, L.P. v. Rich*,
292 A.3d 112 (Del. Ch. 2023) .......... 19

*Off. Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*,
2004 WL 1949290 (Del. Ch. Aug. 24, 2004) .......... 15

*Oswald v. Humphreys*,
806 F. App'x 577 (9th Cir. 2020) .......... 3

*Parnes v. Bally Ent. Corp.*,
722 A.2d 1243 (Del. 1999) .......... 17

*Paskowitz v. Pac. Cap. Bancorp*,
2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) .......... 7

*In re PayPal Holdings, Inc. S'holder Deriv. Litig.*,
2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .......... 7, 8

*Pirelli Armstrong Tire Corp. Med. Benefits Tr. v. Stumpf*,
2012 WL 424557 (N.D. Cal. Feb. 9, 2012) .......... 14

*Porter v. Tex. Com. Bancshares, Inc.*,
1989 WL 120358 (Del. Ch. Oct. 12, 1989) .......... 19, 20

*In re Primedia, Inc. S'holders Litig.*,
67 A.3d 455 (Del. Ch. 2013) .......... 15, 18, 19

*In re Riverstone Nat'l, Inc. S'holder Litig.*,
2016 WL 4045411 (Del. Ch. July 28, 2016) .......... 20

*In re Rocket Fuel Inc.*,
2016 WL 4492582 (N.D. Cal. Aug. 26, 2016) .......... 14

*In re Sagent Tech., Inc. Deriv. Litig.*,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) .......... 9

*Smith v. Carrillo*,
2019 WL 6328033 (D. Del. Nov. 26, 2019) .......... 4

*In re Stem, Inc. Deriv. Litig.*,
2026 WL 880441 (D. Del. Mar. 31, 2026) .......... 2

## TABLE OF AUTHORITIES (CONTINUED)

**Cases** **Page(s)**

*In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*,
2018 WL 3120804 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019) .......... 17

*Tilden v. Cunningham*,
2018 WL 5307706 (Del. Ch. Oct. 26, 2018) .......... 14, 15

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004) .......... 16

*Watt v. Block, Inc.*,
2024 WL 4847384 (S.D. Cal. Nov. 20, 2024) .......... 6

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
2022 WL 345066 (N.D. Cal. Feb. 4, 2022) .......... 3, 5

*In re Zoran Corp. Deriv. Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007) .......... 14

**Statutes and Rules**

8 *Del. C.* § 102(b)(7) .......... 3, 4

15 U.S.C.
§ 78n(a), Exchange Act Section 14(a) .......... *passim*
§ 78u-4(b)(1), PSLRA .......... 3, 5

28 U.S.C. § 1367(c)(3) .......... 3

Fed. R. Civ. P.
Rule 8 .......... 9
Rule 12(b)(6) .......... *passim*
Rule 23.1 .......... *passim*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff's Consolidated Amended Complaint ("CAC" or "Complaint") asserts two types of claims: (i) four counts of derivative claims and (ii) one count of a purportedly direct claim. The derivative claims are ostensibly brought in nominal defendant Green Dot Corporation's ("Green Dot" or the "Company") name against Defendants for breaches of fiduciary duty (Count I); abuse of control (Count II); unjust enrichment (Count III); and violations of Section 14(a) of the Securities Exchange Act (Count IV) (together, the "Derivative Claims"). CAC ¶¶208–29. As explained in Green Dot's concurrently filed motion (the "Company Motion" or "Co. Mot."), which the Court should consider before this one, Plaintiff made no pre-suit demand on Green Dot's board of directors (the "Board") and cannot show that demand would have been futile. Plaintiff therefore lacks standing under Rule 23.1 to pursue the Derivative Claims, which requires dismissal alone. But the Derivative Claims also should be dismissed under Rule 12(b)(6).

As set forth in more detail in the Company Motion, the CAC is a hodgepodge of unrelated, conclusory, group- and puzzle-pled allegations over a sprawling, nearly decade-long period that fails entirely to state any actionable claims. Under Count IV, the only federal claim here, Plaintiff challenges Green Dot's proxy statements, but pleads no actionably false or misleading statements—only generic descriptions of Green Dot's risk-oversight structure. Plaintiff does not adequately plead negligent conduct by any particular Defendant, and alleges no link between the proxy votes and any purported economic harm to Green Dot. With Count IV dismissed, as it should be, the Court should decline to exercise supplemental jurisdiction over the remaining state-law claims under Counts I, II, III, and V.

But the Delaware claims fail as a matter of law, too. Counts I and II assert overlapping theories of breach of fiduciary duty and abuse of control to challenge statements made by different subsets of fourteen current and former directors and

officers on a disparate set of topics over a nearly 10-year period. Plaintiff's group and puzzle pleading does not suffice, and there are no particularized facts pled that any Defendant acted disloyally or in bad faith. And Count III, which seeks to disgorge Messrs. Streit's and Shifke's stock-sale proceeds, does not identify the date of a single trade or the inside information supposedly used.

Plaintiff's last count, Count V, is a purported direct claim for breach of fiduciary duty against the Defendants, brought on behalf of a putative class of Green Dot stockholders, relating to the price of Green Dot's pending merger with CommerceOne Financial Corporation and Smith Ventures LLC (the "Merger"). CAC ¶¶230–35 (the "Merger Claims"). But Plaintiff has no standing to pursue the Merger Claims, either because they are derivative in nature or they rest on an unviable premise of unachieved value. But even with standing, the Merger Claims fail to state a claim because the business judgment rule protects against second guessing the Board's robust, and shareholder approved (by ***over 99%*** of votes), sale process.

The CAC should be dismissed in its entirety.

## II. ARGUMENT[1]

### A. PLAINTIFF'S DERIVATIVE CLAIMS FAIL ON THE MERITS

As the Company Motion explains, Plaintiff lacks standing under Rule 23.1 to pursue the Derivative Claims, and the Court can dismiss them on that basis alone. Co. Mot. at 1–3; *see, e.g.*, *In re Stem, Inc. Deriv. Litig.*, 2026 WL 880441, at *4 (D. Del. Mar. 31, 2026) (court "beg[an] and end[ed] its analysis with" the company's demand futility challenge). But even if demand were excused as to any Derivative Claim, each fails to state a claim under Rule 12(b)(6).

[1] For background on this action, the Defendants respectfully refer the Court to the Company Motion, *see* Co. Mot. at 3–7, which Defendants incorporate by reference, including the defined terms utilized therein.

### 1. Plaintiff Fails to Plead a Section 14(a) Claim, Which Eliminates the Sole Basis for Federal Jurisdiction

Plaintiff's Section 14(a) claim (Count IV) falls well short of the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"). And because it is Plaintiff's only federal claim, *see* CAC ¶10, its dismissal leaves no independent basis for federal jurisdiction, and the Court should decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3); *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 2022 WL 345066, at *7 (N.D. Cal. Feb. 4, 2022) (dismissing Section 14(a) claim for failure to state a claim, and pendent state-law claims for lack of jurisdiction).

To plead an actionable Section 14(a) claim, Plaintiff "must show that (1) the defendant made a material misrepresentation or omission in a proxy statement, (2) the misrepresentation or omission was made with the requisite level of culpability, and (3) the misrepresentation or omission was an essential link in the accomplishment of a transaction proposed in the proxy solicitation." *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *3 (N.D. Cal. Dec. 9, 2008). Because the PSLRA governs Section 14(a) claims, the Complaint must plead with particularity "'each statement alleged to have been misleading' in [Green Dot]'s proxy statement[s] and 'the reason or reasons why the statement is misleading.'" *See Golub v. Gigamon Inc.*, 847 F. App'x 368, 371 (9th Cir. 2021).

Further, where, like here, the nominal defendant's bylaws contain a Delaware General Corporation Law Section 102(b)(7) exculpatory clause that eliminates liability for negligence-based claims, negligence-based Section 14(a) claims fail. *City of Birmingham Relief & Ret. Sys. v. Hastings*, 2019 WL 3815722, at *9 (N.D. Cal. Feb. 13, 2019) (where company had adopted exculpatory clause and plaintiff brought Section 14(a) claim, plaintiff was required to "plead particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally"); *Oswald v. Humphreys*, 806 F. App'x 577, 579–80 (9th

Cir. 2020) ("To survive a Rule 12(b)(6) motion to dismiss, [plaintiff] must allege facts sufficient to rebut the business judgment rule and avoid Identiv's exculpatory clause."); *see also* 8 *Del. C.* § 102(b)(7).

**a. Plaintiff Disclaims Fraud, So the Claim Is Exculpated**

Section 102(b)(7) permits Delaware corporations to enact provisions "eliminating ... the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer," so long as the claim is not for a breach of duty of loyalty and does not sound in fraud or intentional misconduct. *Id.* Green Dot's certificate of incorporation contains such a provision, which provides, in relevant part, that:

> To the fullest extent permitted by law, no director of the Corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director. Without limiting the effect of the preceding sentence, if the Delaware General Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of a director, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

RJN Ex. 3 at 13. Courts applying Delaware law recognize that exculpation applies to derivative Section 14(a) claims. *See, e.g.*, *Hastings*, 2019 WL 3815722, at *9; *Smith v. Carrillo*, 2019 WL 6328033, at *8 (D. Del. Nov. 26, 2019) (holding negligence-based Section 14(a) claims "exculpated" under company's Section 102(b)(7) provision). Because Green Dot "has an exculpatory charter provision, Plaintiff must 'plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper.'" *Hastings*, 2019 WL 3815722, at *9 (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009)). The CAC does the opposite—Plaintiff "specifically *disclaims* any allegations of ... fraud, scienter, or recklessness with regard to" the Section 14(a) claim. CAC ¶224 (emphasis added).

Absent such allegations, the claim fails. *Wells Fargo*, 2022 WL 345066, at *5 (dismissing 14(a) claim where scienter was disclaimed).

**b. Plaintiff Does Not Plead An Actionable Misstatement**

Even if Plaintiff's Section 14(a) claim was not exculpated, he still cannot state a claim. In challenging "statements to stockholders that were contained in [Green Dot's] 2022 and 2023 Proxy Statements," *see* CAC ¶226, Plaintiff pastes pages of block quotes from Green Dot's proxy statements, *see id.* ¶122–28 (the 2022 Proxy Statement); *id.* ¶136–43 (the 2023 Proxy Statement), without identifying which specific portions of those paragraphs are alleged to be false or misleading, and why. This form of puzzle-pleading, leaving both Defendants and the Court guessing as to the nature of Plaintiff's claim, is impermissible under the PLSRA and grounds for dismissal alone. *See Gera v. Palihapitiya*, 2024 WL 3818602, at *12 (D. Ariz. Aug. 14, 2024) (Section 14(a) claim comprised of "block quotes" and "vague explanation[s]" as to falsity was "insufficient to satisfy the PSLRA").

Following his broad assertions of proxy statement language, Plaintiff generally contends that these statements were false or misleading because they omitted "material deficiencies that existed and had existed since 2017 in the Company's internal controls regarding consumer compliance, compliance with AML regulations, and risk identification and assessment." CAC ¶¶128, 143. But the proxy statements made no contrary assurances. Rather, they stated only:

- ***What the Board and compliance/security programs are responsible for*** (*e.g.*, "risk oversight"; "review[ing] risks and exposures relating to significant legal compliance risks"; "[e]nsur[ing] the security, confidentiality, and integrity of Green Dot's information assets"; "safeguarding customer information") *id.* ¶¶124, 126, 137, 139–40; and
- ***The programs, systems, and mechanisms that exist to carry out those responsibilities*** (*e.g.*, "[t]he Risk Committee also reviews ... oversees"; "[t]he Nominating and Corporate Governance Committee reviews ... and monitors";

"[t]he Green Dot Information Security Program applies to all our business operations and activities"; "[t]he CISO and his staff are also tasked with"; "[w]hile the full Board has overall responsibility for risk oversight, the Board has delegated oversight responsibility related to certain risks to the Risk Committee"), *id.* ¶¶124, 126, 137.

District courts routinely hold that generalized statements about the *existence* of compliance, risk management, and security programs are not rendered false by concomitant compliance, risk management, or security problems. *Watt v. Block, Inc.*, 2024 WL 4847384, at *5 (S.D. Cal. Nov. 20, 2024) (routine proxy disclosures about internal controls not rendered false by federal investigation related to internal controls); *Gera*, 2024 WL 3818602, at *12 (dismissing where "quotes contained in both proxy statements" about company's "code of conduct" and "risk oversight" were allegedly false or misleading, but plaintiff "fail[ed] to ... explain—in detail and with specificity—how" they were). "Under [P]laintiff's theory of its case, any company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention. The policy effect of such an approach is questionable." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008) (no falsity where "defendants [we]re not alleged to have provided any qualitative assurances [about] FBR's compliance program").

**c. <u>Plaintiff Does Not Plead a Strong Inference of Negligence</u>**

Because Green Dot's bylaws contain an exculpatory clause, Plaintiff's claim fails for lack of scienter allegations. *Supra* 4–5. But even if the clause did not apply, "a Section 14(a) plaintiff must [still] plead with particularity facts that give rise to a strong inference of negligence." *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005) (affirming dismissal of Section 14(a) claim). Plaintiff's claim expressly rests on negligence, but the Complaint does not plead particularized facts

illustrating how any Defendant departed from ordinary care. For Defendants Brewster, Richey, Date, Fanlo, and Shaheen, Plaintiff points only to their "work experience" and membership on Green Dot's Audit Committee. CAC ¶¶128, 143. Courts reject allegations such as these, which ask courts to "*presume*" negligence. *See Paskowitz v. Pac. Cap. Bancorp*, 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009); *see, e.g.*, *Mendoza v. HF Foods Grp. Inc.*, 2021 WL 3772850, at *11 (C.D. Cal. Aug. 25, 2021) (rejecting Section 14(a) claim premised on "conclusory labels" and "boilerplate references to corporate executive duties"). As to the other Defendants, Plaintiff merely lumps them together, alleging generally that "Defendants" caused Green Dot to issue the proxy statements, and making the banal observation that certain Defendants signed, reviewed, or approved the proxies. CAC ¶¶122, 136; *see Michel v. Sumo Logic, Inc.*, 779 F. Supp. 3d 1038, 1050 (N.D. Cal. 2025) (merely signing a challenged statement is insufficient; the complaint must plead "facts as to why, in reviewing the Proxy, [defendants] 'should have noticed' the alleged omissions were false"). The Complaint does not identify who drafted, reviewed, or approved any specific challenged statement, or what specific information any particular Defendant possessed that should have revealed the statement was misleading. Such group pleading falls short of the PSLRA's particularity requirements. *See, e.g.*, *Mehedi v. View, Inc.*, 2024 WL 3236706, at *15 (N.D. Cal. June 28, 2024) (dismissing where plaintiff failed to "make individualized allegations of negligence" and "allege[d] without differentiation that the Defendants acted negligently").

**d. <u>Plaintiff Cannot Plead Causation</u>**

Plaintiff must also plead that the proxies caused both the transaction in question ("*i.e.*, transaction causation or the essential link requirement") and economic harm ("*i.e.*, loss causation"). *Hastings*, 2019 WL 3815722, at *15. He pleads neither. ***First***, a Section 14(a) claim "requires that the votes solicited by a false proxy statement directly authorize the loss-generating corporate action." *In re PayPal*

*Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018) (citing *Kelley*, 2008 WL 5170598, at *7). The 2022 and 2023 proxy statements solicited votes only on routine annual-meeting matters—elections, compensation, and auditor ratification—none of which authorized the Consent Decree, the failed Republic Bank acquisition, or any other alleged loss. *See* CAC ¶¶146–49, 156–64, 226. "A complaint alleging generally that the mere election of directors was an essential link to the directors' subsequent wrongdoing does not satisfy Section 14(a)'s requirements." *PayPal*, 2018 WL 466527, at *4. ***Second***, Plaintiff identifies no "actual economic harm" caused by the proxies. *Hastings*, 2019 WL 3815722, at *15. Count IV alleges only that the proxies "interfered with Plaintiff's voting rights and choices at the annual meetings," and it seeks only injunctive and equitable relief. CAC ¶228. Whatever harm Green Dot suffered from the Consent Decree flows from the alleged compliance failures, not from the proxies themselves. *See Hastings*, 2019 WL 3815722, at *15 (no loss causation where harms were caused by underlying scheme rather than the proxy statements).

### 2. <u>Plaintiff Fails to State a Claim for Breach of Fiduciary Duty</u>

Through Count I, Plaintiff seeks to hold all fourteen Defendants—including directors and officers whose tenures do not coincide with the challenged events, CAC ¶¶15–28—liable for nearly a decade of alleged corporate misfortune on a generalized theory of breaches of fiduciary duty. According to Plaintiff, Defendants breached their duties by "willfully participat[ing] in misrepresentation of the Company's financial condition, fail[ing] to correct the Company's public statements, and fail[ing] to properly oversee Green Dot's business." *Id.* ¶212.

As a threshold matter, Plaintiff's technique of lumping together each Defendant across a vague set of theories of breach over an approximately ten-year period fails to provide Defendants with fair notice of what they are supposed to have done wrong, *i.e.*, which fiduciary duties were breached based on what behavior, when, and how. The Complaint makes no meaningful effort to provide these answers,

leaving it to Defendants, and this Court, to unscramble Plaintiff's generalized allegations. That is insufficient under Rule 8, and courts repeatedly make clear that such puzzle-style pleading requires dismissal. *See, e.g.*, *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1094–95 (N.D. Cal. 2003) (dismissing fiduciary claims where a "complaint that lumps together thirteen 'individual defendants,' where only three of the individuals [are] alleged to have been present for the entire period of the events alleged in the complaint, fails to give 'fair notice' of the claim to those defendants").

As best Defendants can decipher, the substance of Plaintiff's alleged fiduciary breaches falls into two categories: (1) purported breaches of the "duties of candor and loyalty by repeatedly causing the Company to make misleading statements," *see, e.g.*, CAC ¶3; and (2) alleged mismanagement in "fail[ing] to take action to correct [] material deficiencies" in Green Dot's compliance programs, *see, e.g.*, *id.* ¶128, or "wrongful conduct ... in connection with the failed" Republic Bank transaction, *id.* ¶149.

Because Green Dot's bylaws exculpate its directors from monetary liability for breaches of the duty of care, Plaintiff must plead particularized facts showing that each director acted disloyally or in bad faith, *see supra* 4–5, which he fails to do. But even as to Plaintiff's claims that implicate officer conduct, Plaintiff's conclusory allegations fall far short of stating a claim.

***The Misleading Statement Claims***. Plaintiff challenges two general categories of purported misstatements: (1) alleged misstatements made by Messrs. Streit and Shifke between 2017 and 2019 about Green Dot's prepaid business copied verbatim from the Securities Class Action, *i.e.*, the SCA Allegations, CAC ¶¶65–114; and (2) alleged statements contained in the Company's SEC filings between 2021 and 2023 regarding Green Dot's compliance programs, *i.e.*, the Challenged Compliance Statements, *id.* ¶¶115–43.

Except for the alleged misstatements contained in Green Dot's proxy statements, which fail to state a claim for the same reasons explained *supra* 3–8, where "a communication [is] not associated with a request for stockholder action, such as when [fiduciaries] make periodic financial disclosures required by securities laws ... the fiduciary duty of disclosure does not apply." *Dohmen v. Goodman*, 234 A.3d 1161, 1168–69 (Del. 2020). Instead, "the fiduciary owes 'a duty to stockholders not to speak falsely,'" *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp.*, 302 A.3d 430, 454 (Del. Ch. 2023), which requires allegations that the fiduciaries "must have knowingly disclosed false information," *Goodman*, 234 A.3d at 1169. "By requiring scienter, [courts] have sought to distinguish innocent or negligent disclosure violations from those involving an intent to mislead stockholders." *Id.*

Plaintiff's misleading statement claims plainly do not adequately allege "knowing falsity." Where Plaintiff even attempts to plead Defendants' knowledge, he does so through mere conclusory and group-pled allegations that Defendants "were Green Dot's top executives and directors, and led or were briefed on its day-to-day operations." CAC ¶110; *see also id.* ¶113 ("As senior executive officers and/or directors of Green Dot, the [] Defendants were privy to confidential and proprietary information..."). But courts routinely reject such generalized scienter allegations based on defendants' roles. *See, e.g.*, *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1032 (S.D. Cal. 2006) ("[A] complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions and involvement in the day-to-day management of the company."). Nor does any Individual Defendant's mere "[e]xecution of financial reports, without more, ... create an inference that the directors had actual or constructive notice of illegality." *In re Maxwell Techs., Inc. Deriv. Litig.*, 2014 WL 2212155, at *12 (S.D. Cal. May 27, 2014).

Notably, Plaintiff cannot cite a ***single*** purported Green Dot communication or document that illustrates Defendants' receipt of contradictory information at the time

any statement was made. Plaintiff generally alleges that Defendants "attended both Board and Committee meetings where declining active accounts were discussed," CAC ¶110, without identifying meetings, dates, what was said or presented, or how it rendered which statements false. *See also id.* ¶¶128, 143 (generally referring to "regular reports that Brewster and Richey received from Green Dot's CISO"). In fact, Plaintiff fails to explain altogether how the CISO's reports "on the overall status of the *Information Security* Program and Green Dot's compliance with the program," *id.* ¶¶126, 140 (emphasis added), had anything to do with his allegations of deficient consumer programs.

Nor, in any event, does Plaintiff explain how any statements were materially false when made. *See Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (actionably false statements must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]"). Through the SCA Allegations, where Plaintiff repeatedly challenges statements only made by two of the Defendants—Messrs. Streit and Shifke—Plaintiff indiscriminately block quotes paragraphs of alleged statements with no attempt to particularly allege why each statement was false when made. *See Deseret Tr. Co. v. Unique Inv. Co.*, 2019 WL 7938223, at *4 (C.D. Cal. Sept. 10, 2019) (dismissing fraud-based breach allegations that did not include "the who, what, when, where, and how of the alleged fraudulent conduct"). And the SCA Allegations are replete with challenges to statements that are inactionable as a matter of law, from immaterial puffery, *see, e.g.*, CAC ¶83(a) ("Green Dot continues to gain traction on nearly all fronts"), to statements of belief, *see, e.g.*, *id.* ¶83(d) ("[W]e feel upbeat about the likelihood of continued strong momentum"); *see Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1020–22 (D. Ariz. 2017) (dismissing breach claims challenging statements of puffery or opinion).

Further, while Plaintiff claims that the Challenged Compliance Statements "represented to shareholders that Green Dot maintained effective internal controls

over consumer and anti-money laundering laws," CAC ¶¶115, 129, the plain text shows they represented no such thing. Instead, Green Dot's filings described in neutral terms what various banking laws "require," stated that Green Dot has "adopted policies and procedures to comply with these requirements," and warned that "[s]ignificant penalties and fines ... may be imposed" for non-compliance and that "failure to implement or maintain adequate compliance programs could cause bank regulators not to approve an acquisition." *Id.* ¶¶115–17, 129–30, 133; *see also id.* ¶68 (warning that "our products and services are subject to an increasingly strict set of legal and regulatory requirements intended to protect consumers and to help detect and prevent money laundering"). In other words, the Challenged Compliance Statements did not promise or guarantee that Green Dot would never have compliance failures, and explicitly warned stockholders of that risk. *See also* Co. Mot. at 15–18. And while Plaintiff also challenges Defendant's SOX certifications, those only concern "internal control[s] over *financial reporting*," CAC ¶¶118, 134, 183 (emphasis added)—*not* consumer-compliance programs—and the Complaint alleges no financial restatements, accounting errors, or any single fact to support the conclusory assertion that Green Dot's financial statements "were not prepared in accordance with GAAP," *id.* ¶44(d).

***The Consent Decree Claim***. Plaintiff's theory that Defendants "fail[ed] to properly oversee Green Dot's business," CAC ¶212, which allegedly "directly caused" the Company costs associated with the Consent Decree, *id.* ¶7, is a *Caremark* oversight claim—"possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). For the same reasons that Plaintiff fails to plead a substantial likelihood of liability under this theory in the Rule 23.1 context, *see* Co. Mot. at 12–15, he fails to state a claim under Rule 12(b)(6) as to Defendants. With only conclusory allegations that Defendants "were [] aware that the Company lacked adequate internal controls over consumer and anti-laundering laws," CAC ¶80,

Plaintiff does not make the requisite showing that any Defendant "*knew* that they were not discharging their fiduciary obligations." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

In essence, Plaintiff attempts to plead *Caremark*-by-hindsight based on the mere existence of the Consent Decree. But while Plaintiff casts Green Dot's "business model" as "premised on violations of consumer and anti-money laundering laws," CAC ¶50, the Consent Decree contains no admission of wrongdoing, assigns no blame to any Defendant, and only asserts generalized "deficiencies relating to Green Dot's compliance risk management framework" that the Company had already "took action[] to cease and remediate," *see* RJN Ex. 1. In any event, "courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007); *see In re Amazon.com, Inc. S'holder Deriv. Litig.*, 2024 WL 342405, at *5 (W.D. Wash. Jan. 30, 2024) ("mere existence" of later regulatory action did not show fiduciaries "knew or should have known that the corporation was violating the law").

***The Republic Bank Claim***. Finally, Plaintiff alleges that Green Dot was harmed by the "wrongful conduct of its officers and directors in connection with the failed acquisition" of Republic Bank's Tax Refund Solutions Business. CAC ¶149. The exact nature of this purportedly "wrongful conduct" is unexplained. Plaintiff alleges that the Federal Reserve declined to approve the acquisition, and then quotes Republic Bank's allegations from a lawsuit challenging the transaction breakup, which ultimately settled. CAC ¶¶144–49. Plaintiff's bare speculation about what Green Dot "apparently" did lifted from the unproven allegations of an adversary's complaint, based on a record that is admittedly "not available to the public," *id.* ¶146, plainly does not provide the particularity needed to state a claim. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011) (agreeing that "because allegations from other complaints are unproven and

contested, they do not amount to 'facts' sufficient" to satisfy pleading burdens).

**3. Plaintiff's Abuse Of Control Claim Also Fails**

Plaintiff's abuse of control claim (Count II) asserts that Defendants' "misconduct alleged herein constituted an abuse of their ability to control and influence Green Dot." CAC ¶217. Plaintiff identifies no independently wrongful conduct in this claim, seeks damages for the same alleged "breaches of [] fiduciary obligations of candor, good faith, and loyalty," *id.* ¶218, and therefore this claim should be dismissed as mere "repackaging of claims for breach of fiduciary duties," *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1019 (N.D. Cal. 2007) (dismissing abuse of control claim); *Pirelli Armstrong Tire Corp. Med. Benefits Tr. v. Stumpf*, 2012 WL 424557, at *8 (N.D. Cal. Feb. 9, 2012) (rejecting "proposition that a plaintiff can bring independent claims for ... abuse of control").

**4. Plaintiff Cannot State a Claim for Unjust Enrichment**

Plaintiff's unjust enrichment claim (Count III) seeks disgorgement from Messrs. Streit and Shifke of "all insider trading proceeds." CAC ¶223. The Complaint's trading allegations occupy two sentences, that Mr. Streit allegedly sold 731,191 shares for $56 million, and Mr. Shifke 77,500 shares for $6 million, all "during the Class Period"—an undefined term seemingly transposed from the Securities Class Action. *Id.* ¶114. The Complaint does not identify any trade dates, does not allege what material nonpublic information either Defendant possessed, and does not connect any sale to any challenged statement. *See In re Rocket Fuel Inc.*, 2016 WL 4492582, at *6 (N.D. Cal. Aug. 26, 2016) (dismissing insider trading allegations lacking "specific facts as to what particular material information any individual defendant knew, or when and how he or she knew it"). Similarly, Plaintiff fails to "plead facts to support a reasonable inference that 'each sale by each individual defendant was entered into and completed *on the basis of, and because of*, adverse material non-public information.'" *Tilden v. Cunningham*, 2018 WL 5307706, at *20 (Del. Ch. Oct. 26, 2018) (emphasis in original). Courts cannot "infer

scienter based solely on the size of the trades [and] [p]led facts, not speculation, must support a finding of scienter." *Id.* Count III should be dismissed.

**B. <u>PLAINTIFF'S MERGER CLAIMS SHOULD BE DISMISSED</u>**

Under Count V, Plaintiff asserts a purportedly direct claim against Defendants[2] arising out of the Merger for alleged breaches of fiduciary duty in "[1] not valuing the derivative claims as part of the merger due diligence and valuation process [the 'Litigation Asset Claim';] and [2] also by harming the Company's shareholders through a reduced merger price that was lowered to account for the Consent Decree costs caused by Defendants' wrongdoing [the 'Consent Decree Claim,' and together with the Litigation Asset Claim, the 'Merger Claims']." CAC ¶174; *see also id.* ¶¶230–35.

The Merger Claims must be dismissed. First, Plaintiff lacks standing to pursue these claims. The Consent Decree Claim is derivative in nature, and therefore must be dismissed under Rule 23.1. And, even as a direct claim, Plaintiff fails to establish standing for the Litigation Asset Claim under *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 476 (Del. Ch. 2013). Second, in any event, Plaintiff fails to state a claim under Rule 12(b)(6).

**1. Plaintiff Lacks Standing to Assert the Merger Claims**

**a. <u>The Consent Decree Claim is Derivative</u>**

While Plaintiff pleads the Merger Claims as direct claims, "a claim is not 'direct' simply because it is pleaded that way, and mentioning a merger does not talismanically create a direct action. Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." *Dieterich v.*

---

[2] Emblematic of his group-pleading approach throughout the CAC, Plaintiff includes Defendants in this claim who were no longer with the Company at the time of the Merger, *see, e.g.*, CAC ¶¶15-17, 21, 23-24, and thus cannot be liable for any alleged fiduciary breaches, *see Off. Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 WL 1949290, at *8 (Del. Ch. Aug. 24, 2004) ("[O]nce a director has resigned, that director may no longer be held liable for the subsequent actions of the Board.").

*Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004). Under Delaware law, whether a stockholder's claim is derivative or direct "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). A stockholder's "claimed direct injury must be independent of any alleged injury to the corporation," and that the stockholder "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039.

Here, the Consent Decree Claim is a quintessential derivative claim. The gravamen of Plaintiff's allegations is that Defendants' purported mismanagement "directly caused" Green Dot "the past and ongoing costs of complying with the Consent Decree." CAC ¶171. "The duty implicated 'is plainly the directors' normal duty to manage the affairs of the corporation,' which 'is owed to the corporation and not separately or independently to the stockholders.'" *In re Massey Energy Co. Deriv. & Class Action Litig.*, 160 A.3d 484, 503 (Del. Ch. 2017) (citations omitted). In fact, Plaintiff himself alleges that ***Green Dot***, not any individual stockholder, was the party "severely damaged and injured by the [] Defendants' misconduct," CAC ¶165, including with respect to expenditures of "$44 million to resolve a proposed consent order with the Federal Reserve Board," *id.* ¶166(a), and "[r]emediation efforts with respect to the Consent Order [that] could lead to significant costs" for the "Combined Company," *id.* ¶172. These are "prototypical examples of corporate harm that can be pursued only derivatively." *Massey*, 160 A.3d at 503 ("The prospect of Massey paying fines, penalties, restitution, legal settlements, and the like as a result of defendants' [misconduct] ... constitute[s] harm to the Company by definition").

That Plaintiff attempts to artfully plead these mismanagement claims into a merger context as purported harm to the Merger does not transform his claims into

direct claims. "The fact that such a claim is asserted in the context of a merger does not change its fundamental nature." *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1245 (Del. 1999); *see also In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *10 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019) (distinguishing "challenges to the merger itself and challenges to mere 'wrongs associated with the merger' ... the latter ... give rise to derivative claims"). Plaintiff's allegations that Defendants' prior and unrelated "wrongdoing" caused "a reduced merger price," CAC ¶174, is plainly only a purported "mere 'wrong[] associated with the merger,'" and not a "challenge[] to the merger itself," *Straight Path*, 2018 WL 3120804, at *10; *see also Parnes*, 722 A.2d at 1245 ("[A] claim alleging corporate mismanagement, and a resulting drop in the value of the company's stock, is a classic derivative claim; the alleged wrong harms the corporation directly and all of its stockholders indirectly."). With respect to his Consent Decree Claim, Plaintiff does "not challenge 'the fairness of the price offered in the merger or the manner in which the merger agreement was negotiated,'" but only that "the effect of the defendants' [mismanagement] was to reduce the common shareholders' net distributive share" of merger consideration. *Blue v. Fireman*, 2022 WL 593899, at *7 (Del. Ch. Feb. 28, 2022); *see, e.g.*, CAC ¶175 ("Because the merger consideration was reduced to account for Defendants' wrongdoing and the related costs from the Consent Decree, Plaintiff and the Class will receive lower consideration than they should have[.]").

The Delaware Supreme Court's holding in *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348 (Del. 1988) is illustrative. There, like here, plaintiff argued that the "individual defendants' alleged breaches of fiduciary duty directly and adversely affected the merger consideration," which he posited as "an attack on the 'fairness' of the terms of the merger," and thus a direct claim. *Id.* at 352. The *Kramer* court flatly rejected these arguments, finding that "claim[s] of mismanagement" that were "largely unrelated" to the merger but resulted in "any devaluation of stock" price

"represents a direct wrong to the corporation that is indirectly experienced by all shareholders ... rather than independently by the plaintiff or any other individual shareholder." *Id.* at 353. Thus, like here, "the wrong alleged is entirely derivative in nature." *Id.*

As a derivative claim, the Consent Decree Claim is subject to Rule 23.1 and requires Plaintiff to establish derivative standing in order to maintain the claim. As the Company Motion explains in detail, Plaintiff does not allege the particularized facts required by Rule 23.1 to establish that demand is futile as to any Demand director, as that term is defined therein. Consequently, Plaintiff does not have standing to pursue the Consent Decree Claim.

**a. <u>The Litigation Asset Claim Lacks *Primedia* Standing</u>**

In his Merger Claims, Plaintiff separately alleges the Litigation Asset Claim that Defendants breached their fiduciary duties "by not valuing the derivative claims as part of the merger due diligence and valuation process." CAC ¶174. "A plaintiff claiming standing to challenge a merger directly ... because of a board's alleged failure to obtain value for an underlying derivative claim must meet a three part test." *Primedia*, 67 A.3d at 477. Here, the Litigation Asset Claim fails, at minimum, the first prong of *Primedia*, which requires Plaintiff to "plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted." *Id.*[3] Plaintiff's underlying derivative claims have not survived a motion to dismiss, and are subject to dismissal through the instant motions. For the same reasons detailed herein, *see infra* 19–21, the Derivative Claims are not viable, and therefore "there is no litigation asset to value or maintain, and likewise no value to divert to the controlling stockholder or other derivative action defendants," *Primedia*, 67 A.3d at 477.

---

[3] For the avoidance of doubt, Defendants do not concede that the Litigation Asset Claim survives the second and third prongs of *Primedia*, but rather reserve those arguments at this stage.

### 2. The Merger Claims Fail to State a Claim in Any Event

Even if Plaintiff could establish standing to assert the Merger Claims, which he cannot, these claims should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

***The Litigation Asset Claim***. "The degree to which a court will examine a board's success" at achieving value for the corporation's material assets "depends on the standard of review." *Primedia*, 67 A.3d at 486. "If the business judgment rule applies to the decision to approve the merger, then the court will not second guess the board's effort." *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 172 (Del. Ch. 2023).

Here, the business judgment rule applies and therefore the Litigation Asset Claim must be dismissed. The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *9 (Del. Ch. Mar. 31, 2009) (citation omitted). This was "[a] negotiated, arms'-length merger," *Porter v. Tex. Com. Bancshares, Inc.*, 1989 WL 120358, at *5 (Del. Ch. Oct. 12, 1989), *see* RJN Ex. 5 at 132–38 (detailing robust negotiations and bidding process), with no alleged controlling stockholders or interested parties sitting on both sides of the transaction, *cf. Primedia*, 67 A.3d at 486 ("[T]he entire fairness standard applies if the controlling stockholder receives a benefit not shared with the minority."), commenced only after "adequate[] explor[ation of] possible opportunities" and "after receiving fairness opinions from [] independent financial advisors," *Countrywide*, 2009 WL 846019, at *9; *see* RJN Ex. 5 at 144–61 (detailing fairness opinions). Moreover, Green Dot's shareholders overwhelmingly voted to approve the Merger—with ***over 99%*** of votes cast in favor (*see* RJN Ex. 4 at 5)—and a fully informed, uncoerced vote of disinterested stockholder renders the business judgment rule irrebuttable, *see Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304,

314 (Del. 2015) ("[W]here the stockholders have had the voluntary choice to accept or reject a transaction, the business judgment rule standard of review is the presumptively correct one").

To rebut the "almost impenetrable barrier" of the business judgment rule, *Countrywide*, 2009 WL 846019, at *9, all Plaintiff offers are conclusory allegations that the Defendants "acted in a conflicted manner and engaged in self-dealing by not valuing the derivative claims as part of the merger due diligence and valuation process," CAC ¶174. But these conclusory assertions of "self-dealing" themselves rest on the pure speculation that the Derivative Claims: (i) were not accounted for, and (ii) even had any value to begin with; assumptions which are wholly unsupported. "No rational inference emerges from the record that the Board or its advisors viewed the Derivative Claims as being valuable or something a rational acquiror would pay for." *In re Massey Energy Co.*, 2011 WL 2176479, at *16 (Del. Ch. May 31, 2011).

In any event, Plaintiff's allegation that Defendants "acted in a conflicted manner by seeking to eliminate their own liability," CAC ¶8, through the Merger is both conclusory and wrong. "Court[s] must be wary of such an allegation. If a conclusory allegation—that a potential derivative suit against directors existed, but was extinguished by a merger—was sufficient to show that directors were interested in the merger, much ground for strike suits and other mischief would be possible." *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *8 (Del. Ch. July 28, 2016). The anticipated loss of Plaintiff's derivative standing upon closing does not itself extinguish the underlying claims or eliminate Defendants' potential liability. *See Porter*, 1989 WL 120358, at *5. The mere fact that Plaintiff could no longer pursue the claims derivatively therefore does not establish that Defendants obtained a personal benefit from the Merger. *See id.* at *6.

Nor is there any "basis to infer that the [Green Dot] Board members were secretly harboring a fear for their net wealths because of the pending Derivative Claims, and viewed the transaction as a way to ease those fears." *Massey*, 2011 WL

2176479, at *16. Green Dot's exculpatory provision insulates Defendants from claims of even gross negligence. *See supra* 4–5. "As a result, in order to receive a monetary judgment against the [Defendants], [Plaintiff] will have to prove that the directors and officers acted with scienter," *Massey*, 2011 WL 2176479, at *22, a high hurdle that Plaintiff's conclusory allegations cannot meet, *see supra* 4–5.

***The Consent Decree Claim***. Plaintiff's allegation that Defendants "harm[ed] the Company's shareholders through a reduced merger price that was lowered to account for the Consent Decree costs caused by Defendants' wrongdoing," CAC ¶174, is also completely conclusory. The challenged behavior—that Defendants' purported misconduct "directly caused" the Consent Decree costs, *id.* ¶171—is simply not borne out. Plaintiff alleges that the Consent Decree costs were the consequence of Green Dot's inadequate "consumer compliance risk management and anti-money laundering programs," *id.* ¶164, but nowhere alleges that any Defendant (or which Defendant) ***caused*** those programs to run afoul, or how. Once again, allegations that the Defendants mismanaged the business is a *Caremark* claim that requires particularized facts showing conscious disregard for one's fiduciary duties, which the Complaint falls far short of pleading and is grounds for dismissal alone. *See supra* 12–13; Co. Mot. at 12–15.

But even beyond the conclusory mismanagement allegation, the allegation that the "merger consideration was reduced to account for Defendants' wrongdoing and the related costs from the Consent Decree" is equally unsupported. CAC ¶175. Plaintiff bases this allegation entirely on a single sentence plucked from a 500-page proxy statement that "the budget for necessary remediation efforts was factored into CommerceOne's economic evaluation" of the Merger. *Id.* ¶171. But simply being "factored into" CommerceOne's merger analysis does not mean that CommerceOne's purchase price was directly lowered to account for remediation efforts, and Plaintiff provides no reason to infer otherwise.

## III. CONCLUSION

For these reasons, the CAC should be dismissed.

Dated: October 9, 2026

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *___/s/ James N. Kramer___*
JAMES N. KRAMER
M. TODD SCOTT

Attorneys for Defendants Steven W. Streit, Mark Shifke, Jeffrey B. Osher, Ellen Richey, William I. Jacobs, J. Chris Brewster, Rajeev V. Date, Saturnino Fanlo, Dan R. Henry, Glinda Bridgforth Hodges, George T. Shaheen, George W. Gresham, Michelleta Razon, and Robert Millard

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Steven W. Streit, Mark Shifke, Jeffrey B. Osher, Ellen Richey, William I. Jacobs, J. Chris Brewster, Rajeev V. Date, Saturnino Fanlo, Dan R. Henry, Glinda Bridgforth Hodges, George T. Shaheen, George W. Gresham, Michelleta Razon, and Robert Millard certifies that this brief contains 6,943 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 9, 2026

*/s/ James N. Kramer*
JAMES N. KRAMER